1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

MONTE C. HOISINGTON,

                              Plaintiff,

        v.

ROBIN WILLIAMS, SUSAN N.
DREYFUS, HENRY RICHARDS,
KELLY CUNNINGHAM, and
RONALD VAN BOENING,

                              Defendants.

No. C09-5630 RJB/KLS

**REPORT AND RECOMMENDATION**
**Noted for:  September 10, 2010**

Before the court is the motion for summary judgment of Defendants Robin Arnold Williams, Susan N. Dreyfus, Kelly Cunningham and Ronald A. Van Boening.[1]  Dkt. 28. Plaintiff Monte C. Hoisington filed a response (Dkt. 31) and Defendants filed a reply.  Dkt. 33.

Having carefully reviewed the parties' pleadings, supporting declarations, and balance of the record, and viewing the evidence in the light most favorable to Mr. Hoisington, the undersigned recommends that the Defendants' motion for summary judgment be granted.[2]

## SUMMARY OF CASE

Mr. Hoisington is a resident of the Special Commitment Center (SCC), a facility for the care and confinement of persons detained or civilly committed under Washington's sexually

---

[1] Dr. Henry Richards is the former Superintendent of the Special Commitment Center.  Mr. Hoisington has never served Dr. Richards and therefore, the court has not acquired jurisdiction over Dr. Richards.

[2] Mr. Hoisington has also filed a Motion to Request Class Action Certification Under Rule 23.  Dkt. 25.  In light of the court's finding that Defendants have not violated Mr. Hoisington's constitutional rights, the undersigned recommends that this motion be denied.

REPORT AND RECOMMENDATION - 1

1   violent predator statute (Wash. Rev. Code ch. 71.09).  The SCC is located on McNeil Island.

2   Mr. Hoisington claims that the Defendants violated his constitutional rights when they strip

3   searched him before leaving and on his return to SCC for off-island medical care. Mr.

4   Hoisington asserts that Defendants' blanket strip search policy is unreasonable and punitive and

5   that Defendants are not constitutionally permitted to turn his treatment and care over to the

6   Department of Corrections (DOC) during the off-island trips.

7          When an SCC resident travels off-island, he is taken by ferry.  The DOC is responsible

8   for the transportation and security of the resident pursuant to a written agreement between the

9   SCC and DOC.  Mr. Hoisington also objects to DOC doing strip searches and also appears to

10  object to the use of restraints during transport as being punitive.  Defendants argue that the strip

11  searches performed by a DOC officer before an SCC resident is placed on the ferry are necessary

12  to ensure that the resident is not concealing weapons and contraband that could become a safety

13  issue for the escort officers, other ferry passengers, and court or medical personnel at the off-

14  island site.  Defendants argue that a second strip search performed by an SCC officer once the

15  resident has returned to the SCC is necessary to ensure that the resident has not obtained and

16  concealed sharp objects or controlled substances during his court or medical appointment that

17  could become a safety issue for SCC staff and residents.

18         In addition to the strip searches, the resident is escorted by two DOC corrections officers

19  and is in handcuffs and leg and belly chains for the duration of the off-island visit (except that

20  the leg irons are removed for the ferry crossing).  The escorts also remain with the resident

21  during the court or medical proceeding.

22         Defendants maintain that the searches are based on the security needs of the SCC in

23  preventing escapes, reducing contraband, and ensuring staff and resident safety.  SCC's

REPORT AND RECOMMENDATION - 2

agreement with the DOC requires a search by a DOC officer before an SCC resident is transported off-island.  The agreement also requires restraints when a person is transported regardless of custody level.  Searches by an SCC officer upon return of an SCC resident after off-island transport is an integral part of SCC's program to inhibit the introduction of weapons and contraband into SCC.  Defendants maintain that their policies have remained unchanged since 2001 and apply to all resident off-island transports.

### SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when, viewing the evidence in the light most favorable to the non-moving party, there exists "no genuine issue as to any material fact" such that the "moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A material fact is a fact relevant to the outcome of the pending action.  See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Genuine issues of material fact are those for which the evidence is such that "a reasonable jury could return a verdict for the nonmoving party."  *Id.*

In response to a properly supported summary judgment motion, the nonmoving party may not rest upon mere allegations or denials in the pleadings, but must set forth specific facts demonstrating a genuine issue of fact for trial and produce evidence sufficient to establish the existence of the elements essential to his case.  *See* Fed. R. Civ. P. 56(e).  A mere scintilla of evidence is insufficient to create a factual dispute.  *See Anderson*, 477 U.S. at 252.  In ruling on summary judgment, the court does not weigh evidence to determine the truth of the matter, but "only determine[s] whether there is a genuine issue for trial."  *Crane v. Conoco, Inc.*, 41 F.3d 547, 549 (9th Cir. 1994).

REPORT AND RECOMMENDATION - 3

1

**FACTS**

2        The SCC is operated by the Department of Social and Health Services (DSHS) and is

3  located on McNeil Island, Washington.  Pursuant to an Interlocal Agreement (K8123) between

4  SCC and the DOC, DOC officers are responsible for the off-island transport of SCC residents.

5  Dkt. 29, Attach. B (Dkt. 29-3).  This agreement has governed resident off-island transport since

6  at least April 19, 1998, when SCC was moved from Monroe, Washington to McNeil Island.  Dkt.

7  29, ¶ 6.

8

9        During off-island transport, SCC residents must ride a ferry from McNeil Island

10  to the mainland.  During this transit, residents are in contact with persons who may include

11  inmates from the McNeil Island Corrections Center (MICC); other SCC residents; employees of

12  MICC and SCC; visitors to MICC and SCC; civilian contractors; and, McNeil Island residents

13  and their children.  Upon reaching the mainland, the resident is placed in a DOC vehicle for

14  transport to his/her final destination.  While in the vehicle, the resident is in a confined space

15  with the DOC personnel.   At the end of the resident's transport, the resident will be in contact

16  with members of the public, with medical staff during a medical or hospital visit or with

17  attorneys, jail, and court staff for a legal visit.  Dkt. 29, ¶¶ 7-9.

18

19        Per DOC Policy 420.100.VII. A., Transportation Standards:

20        Offenders transported from a jail or confinement facility with a secured area for a
21        strip search will be strip searched prior to being placed in the transport vehicle.

22  Dkt. 29, Attach. B (Dkt. 29-3), p. 36.   In her affidavit, Cathi D. Harris, SCC Associate

23  Superintendent, states that residents are subjected to two strip searches, one prior to leaving the

24  island and one upon return.  Dkt. 29, ¶ 16.  The residents are also in full restraints and in the

25

26

REPORT AND RECOMMENDATION - 4

presence of two DOC escort staff.  *Id.*  If there is a written policy governing the manner in which either or both of the strip searches are to be performed, it was not provided.

Ms. Harris states that it is her professional opinion that strip searches are appropriate. She bases this opinion on the security needs of the SCC in preventing escapes, reducing contraband, ensuring staff and resident safety, and on the practices of other civil commitment programs for sexual predators.  Dkt. 29, p. 4.  Ms. Harris points to a finding of the Inspection of Care Committee (an independent outside monitoring body for SCC), which has identified the availability of contraband in SCC as a problem the program must address, and states that the strip search requirement is an integral part of SCC's program to inhibit the introduction of weapons and contraband into the confinement facilities.  *Id.*, p. 3.  Ms. Harris cites as examples, the professional judgment of other residential managers or security officers in facilities, such as Illinois, a facility not located within a correctional institution, that conducts strip searches and body cavity searches for all off-grounds visits; Iowa, located within the confines of a correctional institution, where "strip searches occur;" Florida, located independently of any correctional facility, where "strip searches occur;" and, Arizona, located on the grounds of the state hospital, where thorough pat searches are required.  Dkt. 29, pp.  3-4.

According to Ronald Van Boening, McNeil Island Correction Center (MICC) Superintendent, the purpose behind DOC's strip search policy is to ensure the safety and security of the officers conducting the transport, as well as the individuals, often doctors and medical staff or courthouse personnel, located at the off-island site where the visit will take place.  He states that the strip search policy is vital because SCC has lenient standards with regard to what SCC residents can keep in their personal areas at SCC and it is possible that a resident could take

REPORT AND RECOMMENDATION - 5

something with him on an off-island visit that might be used to compromise the safety of the DOC provided transport officers and off-island individuals.  Dkt. 30, ¶¶ 5-6.

Mr. Van Boening also states that in the past, residents have created a disturbance when the elevator doors open by spitting or yelling at members of the public and therefore, it is now standard procedure for confined persons being transported off of McNeil Island to be required to stand in and face the rear of an elevator.  *Id.*, ¶ 8.

Ms. Harris states that strip searches are conducted in a manner that allows the resident to have as much privacy as possible during the search.  *Id.*  The searches are not conducted in public view, the search team is of the same sex as the resident, if an opposite sex escort must be on the search team he/she will observe the person conducting the search without observing the resident and the search is not an invasive body cavity search.  *Id.*

Mr. Hoisington states that when he leaves the island, DOC correctional officers strip search him.  He is transported in blue coveralls with SCC stamped on the back in big black letters.  He is placed in belly restraints and leg irons and then put in the transport van with two DOC guards; a SCC staff member drives the van.  When the van reaches the island dock, he is taken out of the van and the leg irons are removed.  He is then placed on the ferry in an area for SCC residents.  When the ferry arrives at the mainland, DOC guards place the leg irons back on and then Mr. Hoisington waits until it is time for his appointment.  At times, he has waited up to three hours or more.  When it is time for his appointment, the DOC guards place him in the transport car.  Dkt. 31-2, ¶¶ 7-14.

When he arrives at the hospital, Mr. Hoisington is taken to the elevator and instructed by the DOC guards to go to the corner of the elevator and face the wall.  The DOC guards never leave his side and remain with him during every medical procedure that is conducted.  When he

REPORT AND RECOMMENDATION - 6

returns to SCC from his medical appointment, he is put through the same procedure outlined above, except that a SCC staff member strip searches him upon his return. *Id.*, ¶¶ 15-17.

In his complaint, Mr. Hoisington alleged that when he is strip searched, he must remove all of his clothing, lift his genitals, bend over and spread his buttocks. Dkt. 5, p. 8. The Defendants do not dispute Mr. Hoisington's description as to how the strip search is conducted. He states that the procedure is humiliating and degrading. *Id.* The door to the room at the SCC where he has been strip searched is always open and there have been up to six staff members there. *Id.*, ¶ 22.

Mr. Hoisington was taken off-island for 8 medical appointments between 2005 and 2009. Dkt. 31, p. 22. He has never assaulted any DOC or SCC staff; he has no record in DOC or SCC of drug and/or contraband possession; and, he has never tried to escape. Dkt. 31, p. 24.

## DISCUSSION

There are two issues presented for consideration: (1) whether SCC's blanket strip search policy violates Mr. Hoisington's Fourth Amendment rights; and (2) whether being placed under the control of DOC officers during off-island transports violates Mr. Hoisington's Fourteenth Amendment right to non-punitive conditions of confinement.

## A.    SCC's Blanket Strip Search Policy

In considering the reasonableness of the strip searches at SCC, the court looks to established case law as it pertains to pretrial detainees. Courts have long recognized that the constitutional rights of pretrial detainees may be limited in the interest of jail security and order. *Bell v. Wolfish,* 441 U.S. 520, 545, 99 S. Ct. 1861, 60 L.Ed.2d 447 (1979); *Michenfelder v. Sumner,* 860 F.2d 328, 331 (9th Cir. 1988). In *Bell,* the Supreme Court set forth a balancing test to evaluate the reasonableness of the search:

REPORT AND RECOMMENDATION - 7

This test weighs the prison's security and penological needs against the pretrial detainee's right to be free from unreasonable searches. Factors to be considered in the balancing process include: 1) the scope of the particular intrusion; 2) the manner in which the search is conducted; 3) the justification for initiating the search; and, 4) the place in which the search is conducted.

*Bell*, 441 U.S. at 559.

The Ninth Circuit also instructs that when the purpose of the search policy at issue is to further institutional security goals within a detention facility, the principles articulated in *Turner v. Safley*, 482 U.S. 78, 107 S. Ct. 2254, 96 L.Ed.2d 64 (1987), must also govern the analysis. When reviewing a detention facility's restrictions of constitutional rights that are inconsistent with incarceration, *Turner* directs courts to consider whether the challenged restriction was "reasonably related to legitimate penological interests." 482 U.S. at 89, 107 S. Ct. 2254. By considering the reasonableness of a search policy in a detention facility context, the following factors must be considered: (1) the existence of a "valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it"; (2) "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally"; and (3) "the existence of obvious, easy alternatives" as evidence that the regulation "is an 'exaggerated response' to prison concerns." *Id.* at 89-91, 107 S. Ct. 2254. In considering these factors, the court should defer to "the informed discretion of corrections officials." *Id.* at 90, 107 S. Ct. 2254. *Bull v. City and County of San Francisco*, 595 F.3d 964, 971 (9th Cir. 2010).[3] The court turns first to the factors articulated in *Bell*.

---

[3] The court notes that the holding in *Bull* is narrowly applied "only to detainees classified to enter the general corrections facility population." *Bull v. City and County of San Francisco*, 595 F.3d 964, 981 n.17 (9th Cir. 2010).

REPORT AND RECOMMENDATION - 8

The first two *Bell* factors are (1) the scope of the particular intrusion and (2) the manner in which the search is conducted.  Defendants state that strip searches are conducted in a manner that allows the resident to have as much privacy as possible; are not conducted in public view; the search team is of the same sex as the resident; and, the search is not an invasive body cavity search.  Dkt. 29, ¶ 19.  Mr. Hoisington does not dispute this description except with regard to the strip search when he returns to SCC.  That strip search occurs in a room "but the door to that room is always open and there have been up to six staff there." Dkt. 31-2, ¶ 22.  These facts alone are insufficient to support a claim that the manner and scope of the searches are unconstitutional.  *See, e.g., Michenfelder,* 860 F.2d at 333 (upholding strip searches of prisoners conducted at end of hallway visible to other prisoners and some officers).

The third *Bell* factor is the justification for the policy itself.  *Bell,* 441 U.S. at 559, 99 S. Ct. 1861.  The Ninth Circuit has explained that a jail policy on strip searches is not "constitutionally acceptable simply by virtue of jail officials' invocation of security concerns … rather the policy must be 'reasonably related' to the [detention facility's] interest in maintaining security." *Way v. County of Ventura,* 445 F.3d 1157, 1161 (9th Cir. 2006) (citations omitted).

Defendants base the need for the strip searches on the professional judgment of the Associate Superintendent that the searches will prevent the introduction of contraband into SCC. The existence of contraband in SCC has been identified as an issue.  Defendants maintain that the strip searches are conducted before an SCC resident leaves SCC to minimize the risk of a resident concealing a sharp object that could be used to harm someone or facilitate an escape. Dkt. 29, ¶ 18.  Defendants state that this risk is real because SCC has lenient standards regarding what SCC residents can have in their personal areas at the facility.  Dkt. 30, ¶ 6.  DOC Policy 420.100.VII.A. provides that an "offender will be strip searched when being transported from a

jail or confinement facility with a secured area for a strip search."  According to SCC's associate superintendent, the safety of transport officers and people in the community is vastly enhanced by the pre-transport searches and secure transport of SCC residents by trained DOC officers. Dkt. 34, p. 2.

SCC residents are also searched after they are returned to the SCC.  Dkt. 29, ¶ 16. Defendants maintain that this search is required to prevent SCC residents from bringing contraband (weapons, sharp objects, controlled substances) from a jail facility or doctor's office into the SCC.  *Id.*  Dkt. 34, ¶ 6.   DOC Policy 420.100.VII.C. provides that "[o]ffenders will be under constant surveillance until released in the presence of receiving staff at the Department facility" and strip searched as part of the in-processing.

Defendants state that since 2008, there have been 19 reports of resident assaults on staff at SCC.  Dkt. 34, ¶ 5.  In addition, it is undisputed that the availability of contraband in SCC is a problem.  Defendants also rely on the experience of other facilities, such as those in Illinois, Iowa, Florida and Arizona, where strip searches and pat searches are utilized, in determining that the searches instituted at SCC for off-island transports can be helpful in eliminating the introduction of contraband and inhibiting escape attempts.  (Dkt. 29, ¶¶ 13, 14).

There is no evidence that SCC's off-island transports have led to the discovery of any contraband.  However, the absence of such evidence may indicate that SCC's policy is, in fact, effective.  Moreover, in *Bell*, the Court found only one instance of smuggling and that was sufficient to uphold a blanket strip search policy.  *See, e.g., Bell,* 441 U.S. at 559, 99 S. Ct. 1861 (one instance in which contraband was found during a body cavity inspection).  Here, SCC's strip search policy is less invasive and SCC should not have to wait to find someone smuggling before instituting a similar policy.

REPORT AND RECOMMENDATION - 10

The final *Bell* factor examines the place in which the search is conducted.  Mr. Hoisington alleged that when he is searched at SCC, the door remains open and on at least one occasion, six SCC staff members were present.  Defendants state that the strip searches are conducted in a manner that allows the resident to have as much privacy as possible and outside of public view.  The only evidence in support of Plaintiff's position, therefore, is the fact that the door remains open and that during one search there were six guards present.  As noted above, these facts, by themselves, are insufficient to support Mr. Hoisington's claims.  *See, e.g., Michenfelder,* 860 F.2d at 333 (upholding strip searches of prisoners conducted at end of hallway visible to other prisoners and some officers).  There is no evidence that SCC's policy required the use of "exaggerated or excessive means to enforce security."  *Id.*  Furthermore, even assuming Mr. Hoisington was strip-searched with the door open, there is no evidence that the search was not conducted with as much privacy as possible.

The court notes that in *Bell*, the Supreme Court sustained against a Fourth Amendment challenge the practice of conducting routine visual body cavity searches following contact visits, even though there had been only one reported attempt to smuggle contraband into the facility in a body cavity.  The purpose of the visual cavity searches in *Bell* was to discover and deter smuggling of weapons and contraband, which was found to be a byproduct of contact visits.  Given the security demands and the need to protect not only other inmates but also the facility's personnel, visual body cavity searches were not regarded as excessive.  *Bell,* 441 U.S. at 558-560, 99 S. Ct., at 1884-1885, n. 40.  Similarly, in *Block v. Rutherford,* 468 U.S. 576, 104 S. Ct. 3227 (1984), the Supreme Court found a blanket prohibition on contact visits to be an entirely reasonable, nonpunitive response to the legitimate security concerns identified, consistent with the Fourteenth Amendment.  *Id.* at 588 (citing *Wolfish,* 441 U.S. at 559-560, n. 40, 99 S. Ct. at

REPORT AND RECOMMENDATION - 11

1884-1885, n. 40.   In *Block,* the Supreme Court reiterated that it was unwilling to substitute its judgment "on these difficult and sensitive matters of institutional administration and security for that of 'the persons who are actually charged with and trained in the running,' of such facilities." *Block*, 468 U.S. at 587 (citing *Wolfish*, *id.*, at 562, 99 S. Ct., at 1886).

The court also recognizes "the difficulty of operating a detention facility safely, the seriousness of the risk of smuggled weapons and contraband, and the deference [owed] jail officials' exercise of judgment in adopting and executing policies necessary to maintain institutional security. *Bell,* 441 U.S. at 546-47, 559, 99 S. Ct. 1861.

In this case, Defendants have raised legitimate security concerns – the presence of contraband and access to contraband by SCC residents before and during off-island visits. Applying the *Bell* factors to Defendants' blanket strip search policy, the court finds that SCC's blanket strip search policy is reasonably related to SCC's interest in maintaining security. Accordingly, even if a particular search at issue here might be characterized as unconstitutional, Mr. Hoisington has failed to show such search was conducted pursuant to an unconstitutional policy.

For the same reasons that the court finds Defendants' evidence sufficient under the *Bell* factors, it finds the evidence sufficient under the *Turner* factors.  As noted above, *Turner* directs courts to consider whether the challenged restriction was "reasonably related to legitimate penological interests."  482 U.S. at 89, 107 S. Ct. 2254.  We must consider (1) the existence of a "valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it"; (2) "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally"; and (3) "the existence of obvious, easy alternatives" as evidence that the regulation "is an

REPORT AND RECOMMENDATION - 12

1   'exaggerated response' to prison concerns."  *Id.* at 89-91, 107 S. Ct. 2254.[4]   In considering these

2   factors, the court should defer to "the informed discretion of corrections officials."  *Id.* at 90, 107

3   S. Ct. 2254.

4           As noted above, Defendants have provided evidence that the existence of contraband

5   within SCC is a serious problem and that SCC's blanket strip search before and after off-island

6   transports are an integral part of SCC's methodology to prevent smuggling of contraband,

7   ensuring the safety of employees and the public, and preventing escapes.  The record includes

8   the declaration of SCC's associate superintendent that the policy is "especially important when a

9   resident will be temporarily housed in a jail facility where there is the possibility for contraband

10  to be more easily obtained by the resident at the jail but it is also important when a resident has

11  access to members of the public or to sharp objects and controlled substances such as at a

12  doctor's office or hospital."  Dkt. 29, ¶ 18.   MICC's superintendent stated in his declaration that

13  the purpose of the policy is to "ensure the safety and security of the officers conducting the

14  transport, as well as the individuals, often doctors and medical staff or courthouse personnel,

15  located at the off-island site where the visit will take place."  Dtk. 30, ¶ 5.   Mr. Hoisington's

16  suggestion that no one off-site would give something dangerous to a detainee is insufficient to

17  establish an issue of material fact of whether the policy is reasonably related to legitimate

18  penological interests.

19          With regard to *Turner's* concern for prison resources, the record reflects that "transport

20  staff has the expectation that strip searches will be conducted for their own protection" and that

---

[4] According to the Ninth Circuit, the second *Turner* factor, "whether there are alternative means of exercising the right that remain open to prison inmates," is not applicable to search policies, because the right to be free from unreasonable searches is not a right susceptible to exercise by alternative means.  *Michenfelder*, 860 F.2d at 331 n. 1 (citing *Bell*, 482 U.S. at 90, 107 S. Ct. 2254).

REPORT AND RECOMMENDATION - 13

there are "serious concerns for the safety of the transport staff if [the searches] were eliminated."

Dtk. 29, ¶ 20.  DOC Policy 420.100 and the Interlocal Agreement emphasizes safety and security

during transports and requires officers to have training in emergency procedures, restraint and

use of force options.  Dkt. 30, ¶ p 3, 9.  If the strip searches are eliminated, residents who desire

to conceal contraband or weapons will be able to pass it to other SCC residents and this could

also increase the likelihood of strong-arming between residents.  Dkt. 29, ¶¶ 15, 18.

When the allocation of resources and the ability of administrators to protect staff and

detainees at the facility are at issue, "courts should be particularly deferential to the informed

discretion of corrections officials."  *Turner,* 482 U.S. at 90, 107 S. Ct. 2254.  *See also, Overton v.*

*Bazzetta,* 539 U.S. 126, 132, 123 S. Ct. 2162, 156 L.Ed.2d 162 (2003) (the burden of proof is

not on defendants to establish the validity of the challenged regulation, but on plaintiff "to

disprove it.")

Defendants did not specifically address the impact on SCC resources if the strip search

policy were eliminated.  On the other hand, security concerns regarding the flow of contraband at

the SCC is well documented and, it cannot be concluded that Mr. Hoisington met his burden of

showing that SCC's strip search policy is "an exaggerated response to prison concerns," *Turner,*

482 U.S. at 90, 107 S.Ct. 2254.  This is particularly true because the Supreme Court in *Bell*

"determined that a strip search policy is reasonable in a facility with only a single confirmed

smuggling incident."  *Bull*, 595 F.3d 964 (*citing Bell,* 441 U.S. at 559, 99 S. Ct. 1861 and

*Turner,* 482 U.S. at 90, 107 S. Ct. 2254).  The SCC need not wait until a resident has smuggled

contraband out of the SCC or into the SCC after a visit to the doctor or his attorney before

instituting a policy designed to prevent such smuggling.

REPORT AND RECOMMENDATION - 14

Mr. Hoisington has failed to create a material issue of fact as to whether he suffered a violation of a constitutional right when he is subjected to SCC's blanket strip search policy. The strip searches are not done on a random basis, but are conducted pursuant to a policy requiring all residents to be inspected prior to and after their return to the island. It is undisputed that SCC residents can and do bring contraband into SCC, that they have freer access to contraband at the SCC, and that they will have contact with persons outside the SCC during transport. The existence of these opportunities to obtain contraband and take it out of or into the SCC provides a legitimate, non-punitive reason, to apply the blanket strip search policy to SCC residents during off-island transports.

**B.      DOC Involvement in Off-Island Transports**

Plaintiff also alleges that his Fourteenth Amendment rights to adequate care and individualized treatment were violated when Defendants entered into a contract with the DOC which places Plaintiff in the total care and custody of the SCC for all off-island trips and when Defendants allowed the DOC correctional officers to humiliate and degrade Plaintiff. Dkt. 5, p. 12. Plaintiff argues that it is impermissible and punitive to return him to the custody of the DOC. Dkt. 31, p. 10. In part, he argues that the definition of "correctional institution" found in RCW 9.94.049 applies only to those facilities under the supervision of the DOC used solely for the confinement of convicted felons. *Id.*

Plaintiff is civilly committed at SCC as a sexually violent predator and, as such, he is "entitled to conditions of confinement that are not punitive." *Jones v. Blanas*, 393 F.3d 918, 933 (9th Cir.2004); *see also Youngberg v. Romeo*, 457 U.S. 307, 321-22, 102 S. Ct. 2452, 73 L.Ed.2d 28 (1982) ("[P]ersons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are

REPORT AND RECOMMENDATION - 15

designed to punish"); *see Bell v. Wolfish*, 441 U.S. 520, 535, 99 S. Ct. 1861, 60 L.Ed.2d 447

(1979) (pretrial detainees retain greater liberty protections than individuals detained under

criminal process).  In addition, under the Fourteenth Amendment's due process clause, the State

must provide adequate medical care to sexually violent predators and other involuntarily civilly

committed individuals.  *Youngberg v. Romeo*, 457 U.S. 307, 324 102 S. Ct. 2452 (1982); *Gibson

v. County of Washoe, Nevada*, 290 F.3d 1175, 1188-89 n. 9 (9th Cir. 2002), *cert. denied*, 537

U.S. 1106, 123 S. Ct. 872, 154 L.Ed.2d 775 (2003); *Hydrick*, 500 F.3d at 998.

It is undisputed that Mr. Hoisington's off-island transports were conducted so that he

could receive medical care.  Although he was under the control of DOC officers during transport

to his medical appointments, he was not "in custody" of the DOC.  Detainees at the SCC are

sexually violent predators who are considered extremely dangerous.  *See, e.g.,* RCW 71.09.010.

SCC residents are required to be kept in a secure facility (*see, e.g.,* RCW 71.09).  It cannot be

argued that they are not also to be kept secured during transport.  The agreement between SCC

and DOC governing resident off-island transport has been in effect since 1998 when SCC was

moved from Monroe, Washington to McNeil Island.  The court is unaware of any authority

supporting Mr. Hoisington's claim that SCC cannot contract with DOC to provide off-island

transport. [5]

---

[5] Defendants rely on an August 14, 2001 Order entered by U.S. District Judge William Dwyer in *Turay v. Selig*,
Case No. C91-664, for the general proposition that the court recognized that there would be limited involvement by
DOC in the secure transportation and temporary custody of SCC residents.  Dkt. 28, p. 12.  Plaintiff cites to an order
in the same case, holding that "routine or random strip searches of SCC residents will not be made, and that such
searches will be made in accordance with the previous policy, i.e., upon reasonable suspicion that contraband has
been passed."  Dkt. 31, p. 3.  Plaintiff did not provide the court with a copy of this order or a citation from which the
court might extract the order from the voluminous docket in the *Turay* case.  However, it appears that the rulings
appear to be related to routine or random searches conducted for no designated reason.  Here, there is a valid reason
for the strip search, *i.e.,* a detainee is leaving or returning to the island.

REPORT AND RECOMMENDATION - 16

1    Mr. Hoisington has failed to raise a material issue of fact relating to his claims that

2 Defendants have violated his Fourteenth Amendment rights.  Therefore, Defendants are entitled

3 to summary judgment on this claim.

4 **C.    Eleventh Amendment Immunity**

5    Defendants move for summary judgment on all damage claims brought by Plaintiff

6 against the Defendants in their official capacities.  Plaintiff does not oppose the motion, but

7 states that to the extent his complaint is not entirely clear that he seeks monetary damages from

8 all of the defendants in their individual capacities only, he asks that he be allowed to amend his

9 complaint to clarify that he also seeks money damages from Defendants Kelly Cunningham and

10 Ronald Van Boening.  Dkt. 31, p. 16.

11    Absent a waiver of sovereign immunity, neither states nor state officials in their official

12 capacities are subject to suit in federal court under 42 U.S.C. § 1983.  *Will v. Michigan Dept. of*

13 *State Police,* 491 U.S. 58, 71, 109 S. Ct. 2304, 105 L. Ed. 2d 45 (1989).   A suit against a state

14 official in his or her official capacity is not a suit against the official but rather is a suit against

15 the official's office.  *Brandon v. Holt,* 469 U.S. 464, 471, 105 S. Ct. 873, 877, 83 L. Ed. 2d 878

16 (1985).  As such, it is no different from a suit against the State itself.  *See Kentucky v. Graham,*

17 473 U.S. 159, 165-66, 105 S. Ct. 3099, 3104-05, 87 L. Ed. 2d 114 (1985); *Monell v. Dep't of*

18 *Social Servs. of City of New York*, 436 U.S. 658, 690, n.55, 98 S. Ct. 2018, 2035, n.55, 56 L. Ed.

19 2d 611 (1978).   The limited exception to this rule is found in *Ex Parte Edward T. Young*, 209

20 U.S. 123, 28 S. Ct. 441, 52 L. Ed. 714 (1908) (in suit seeking prospective remedy for continuing

21 violation of federal law, court may enjoin state officials).

22    To the extent that any of Plaintiff's allegations can be understood as claims against

23 defendants in their official capacity, the court agrees that those claims must be dismissed.

REPORT AND RECOMMENDATION - 17

1

**D.      Injunctive Relief**

2

Defendants assert that under *Bull,* 595 F.3d at 964, Plaintiff has no right to injunctive

3

relief prohibiting Defendants from conducting strip searches of residents before and after off-

4

island travel or in contracting with DOC to provide escorts for off-island travel.

5

6

Where injunctive and declaratory relief is sought, the allegations must demonstrate that

plaintiff faced a "real and immediate" threat of direct injury as a result of the challenged official

7

8

conduct.  *City of Los Angeles v. Lyons*, 461 U.S. 95, 101, 103 S. Ct. 1660, 75 L.Ed.2d 675

9

(1983).  In order to assert claims on behalf of a class,[6] a named plaintiff has standing to seek

10

injunctive relief where the harm is "directly traceable to a written policy," or that the harm is part

11

of a "pattern of officially sanctioned behavior."  *Armstrong v. Davis*, 275 F.3d 849, 861 (9th

12

Cir.2001) (citing *Gomez v. Vernon*, 255 F.3d 1118, 1127 (9th Cir.2001); *LaDuke v. Nelson*, 762

13

F.2d 1318, 1323 (9th Cir.1985)).

14

15

Here, Plaintiff challenges a practice under which all SCC residents are strip-searched

when the leave the SCC and when they return the SCC for off-island visits.  This blanket policy

16

17

was apparently in effect at the time the litigation was commenced and is currently still in effect.

18

Thus, Plaintiff (and the class he seeks to represent) faces a real and immediate threat of being

19

subjected to a strip search again.  The *Bull* case relied on by Defendants is not dispositive on this

20

issue as its narrow holding applies "only to detainees classified to enter the general corrections

21

facility population."  *Bull*, 595 F.3d at 981 n.17.  Defendants must still show that there is a valid,

22

23

rational connection between their strip searches and the legitimate governmental interest put

24

forward to justify it.  As noted above, they have done so.  Accordingly, the undersigned

25

26

---

[6] Plaintiff's motion to certify this action as a class action is pending.  Dkts. 19 and 20.

REPORT AND RECOMMENDATION - 18

1  recommends that Defendants' motion for summary judgment on Plaintiff's claims for injunctive

2  relief be granted.

3  **E.     Qualified Immunity**

4          Even assuming that Defendants violated Mr. Hoisington's constitutional rights, the grant

5  of judgment as a matter of law would be appropriate if the Defendants are entitled to qualified

6  immunity for the strip searches.  "Qualified immunity is 'an entitlement not to stand trial or face

7  the other burdens of litigation.'"  *Saucier v. Katz*, 533 U.S. 194, 200, 121 S. Ct. 2151, 150

8  L.Ed.2d 272 (2001) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S. Ct. 2806, 86 L.Ed.2d

9

10  411 (1985)).   The court evaluates a defendant's qualified immunity defense using a two-step

11  inquiry.  *Id.*   However, the Supreme Court recently held that this two-step inquiry is no longer an

12  inflexible requirement.  *Pearson v. Callahan*, ---U.S. ---, 129 S.Ct. 808, 818, 172 L.Ed.2d 565

13  (2009) (explaining "that, while the sequence set forth [in *Saucier*] is often appropriate, it should

14  no longer be regarded as mandatory").  It is within our "sound discretion in deciding which of

15  the two prongs of the qualified immunity analysis should be addressed first in light of the

16

17  circumstances in the particular case at hand."  *Id.*

18          Under *Saucier's* first prong, the court must determine whether, viewing the facts in the

19  light most favorable to the plaintiff, the government employees violated the plaintiff's

20  constitutional rights.  *Saucier*, 533 U.S. at 201, 121 S. Ct. 2151.  If the court determines that a

21  constitutional violation has occurred, under *Saucier's* second prong, it must determine whether

22  the rights were clearly established at the time of the violation.  *Id.*  For a right to be clearly

23  established, its contours "must be sufficiently clear that a reasonable official would understand

24

25  that what he is doing violates the right."  *Id.* at 202, 121 S. Ct. 2151 (quoting *Anderson v.*

26  *Creighton*, 483 U.S. 635, 640, 107 S. Ct. 3034, 97 L.Ed.2d 523 (1987)).  The protection afforded

REPORT AND RECOMMENDATION - 19

by qualified immunity "safeguards 'all but the plainly incompetent or those who knowingly

violate the law.'"  *Brewster v. Bd. of Educ. of the Lynwood Unified Sch. Dist*., 149 F.3d 971, 977

(9th Cir.1998) (quoting *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271

(1986)).

The court has concluded that Defendants did not violate Mr. Hoisington's constitutional

rights.  Therefore, it is not necessary to address Defendants' qualified immunity arguments.

## CONCLUSION

The undersigned recommends that Defendants' motion for summary judgment (Dkt. 28)

be **Granted** and that Plaintiff's motion to request class certification (Dkt. 19) be **Denied.**

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil

Procedure, the parties shall have fourteen (14) days from service of this Report to file written

objections.  See also Fed. R. Civ. P. 6.  Failure to file objections will result in a waiver of those

objections for purposes of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985).  Accommodating the

time limit imposed by Rule 72(b), the Clerk is directed to set the matter for consideration on

**September 10, 2010**, as noted in the caption.

DATED this   16th   day of August, 2010.


Karen L. Strombom
United States Magistrate Judge

REPORT AND RECOMMENDATION - 20